Filed 6/21/16  P. v. Gonzalez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>LUIS MIGUEL GONZALEZ et al.,<br><br>    Defendants and Appellants. | F068060<br><br>(Kern Super. Ct. Nos. BF143990A &<br>BF143990B)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  Charles R. Brehmer, Judge.

Rita Barker, under appointment by the Court of Appeal, for Luis Miguel Gonzalez, Defendant and Appellant.

Patricia L. Brisbois, under appointment by the Court of Appeal, for Eric Castilleja, Defendant and Appellant.

Kamala D. Harris, Attorney General, Michael P. Farrell, Assistant Attorney General, Daniel B. Bernstein and Craig S. Meyers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

# **INTRODUCTION**

Appellants/defendants Luis Miguel Gonzalez (Gonzalez) and Eric Castilleja (Castilleja) were charged and convicted of multiple felonies based on their activities when they drove around Bakersfield and committed a series of robberies. One of the victims obtained the license plate number of defendants' truck. Shortly after defendants were arrested, several of the victims identified one or both of them during infield showups.

In this joint appeal, Castilleja, joined by Gonzalez, contend the trial court violated their constitutional rights to due process and a fair trial when it decided to discharge a juror for alleged misconduct in the midst of deliberations.

Castilleja separately contends that his defense attorney was prejudicially ineffective for failing to file a motion for the court to dismiss one of his prior strike convictions because both strikes arose from the same case.

Gonzalez separately contends the court imposed an unauthorized sentence for one of the counts.

In part I, we will review the facts of the offenses. In part II, we will address the procedural history which led to the court's decision to remove the juror during deliberations.

We affirm the convictions of both defendants. As to Gonzalez, we will order the abstract of judgment corrected. As to Castilleja, we will order a limited remand for a new sentencing hearing for him to file motions pursuant to *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*) and *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*), supported by the appropriate documentary evidence.

# PART I

## FACTS

### Attempted murder of Daniel Chavez (Counts I and II)

Shortly after 1:00 a.m. on September 12, 2012, Daniel Chavez (Chavez) drove his SUV to a residence on Baker and California Streets to meet a woman. Chavez parked his vehicle on the left side of the street, in front of the residence. He called the woman and said he was there.[1]

Chavez was waiting in his vehicle, with the engine running, when a green Chevrolet Silverado, double cab truck pulled up next to the driver's side of his vehicle. The truck's passenger door opened and a man leaned out. He asked Chavez where he was from. Chavez replied that he did not "bang" and he "wasn't from nowhere."

Chavez testified the man in the green truck's passenger seat turned toward him, pulled a handgun, and immediately fired one shot at Chavez. Chavez was wounded in his right hand. Chavez accelerated his truck and rapidly drove away. Chavez lost control because of his gunshot wound and crashed into a tree. He ran from his vehicle and tried to hide in the neighborhood. He asked a bystander to call the police. The green truck drove around the area several times. Chavez believed they were looking for him.

The police arrived at the scene and Chavez emerged from his hiding place. Chavez told the police that there were at least three people in the truck.

Chavez was taken to the hospital for treatment of a gunshot wound to his right hand. The wound left him unable to use one finger.

### Robbery of Rosa Garcia (Count III)

Also on September 12, 2012, Rosa Garcia (Garcia) was working as a taxi driver and experienced problems with the brakes on her taxi cab. Around 2:20 a.m., Garcia

---

[1] Chavez testified he had a prior misdemeanor conviction for soliciting a prostitute in 2012. Chavez testified he received gas money and a witness fee, and the district attorney paid for his hotel room, in order to testify. Chavez also testified that he asked the prosecutor to dismiss a parking ticket case in exchange for his testimony.

parked her taxi cab at the AM/PM gas station on Union Avenue and called a coworker to help her.

Garcia waited in her taxi cab and left the driver's side door open. She noticed an older model, blue/turquoise extended cab pickup truck drive by the gas pump across from her location. The truck had a loud muffler. The truck's passenger looked at Garcia. The truck went through the gas station and then drove away.

The truck returned within a few minutes. It pulled alongside Garcia's cab so that the truck's passenger door was adjacent to Garcia's driver's seat. Garcia could see both the driver and the passenger.

Garcia testified that the man sitting in the passenger seat called out to her, and asked for directions. As Garcia started to respond, the passenger got out of the truck and walked toward her. Garcia noticed the truck's driver was Hispanic. She could not see if someone was sitting in the rear extended cab section of the truck.

As the passenger approached her cab, Garcia saw a gun sticking out of his waistband. Garcia tried to close her driver's door, but the gunman stepped inside the car and told Garcia, " 'Give me what you got.' " He did not draw the gun. Garcia was afraid and told the man that she understood. Garcia turned over $142, which was her taxi fare money from that night.

The gunman got back into the passenger side of the truck, and they left the gas station. Garcia saw the truck's license plate number and entered it into her cell phone so she could tell the police.

Garcia called the police and provided a description of the truck, the passenger, and the vehicle's license plate number.

**Robbery of Francisco Gonzales (Count IV)**

Sometime around 2:30 a.m. on September 12, 2012, Francisco Gonzales (Francisco)[2] was walking on Baker Street. A green Chevrolet truck with a loud muffler drove by him. The truck made a U-turn and drove back to Francisco's location. The truck's passenger side pulled up to Francisco's location.

Francisco testified a man got out of the passenger side of the truck and walked up to him. The man pulled a handgun, pointed it at Francisco's head, and asked where he was from. Francisco said, " 'I'm not from anywhere. I was just going home.' "

Francisco testified he begged for his life and was afraid he was going to be killed. The gunman cursed and told Francisco to give him everything he had. Francisco turned over his cell phone, knife, and cash. Francisco was terrified and said, " 'Please don't shoot me.' " The gunman took the property and then punched Francisco in the head with his fist.

The gunman returned to the passenger side of the truck, and the truck "skidded off." Francisco ran away.

Francisco called 911 at 2:31 a.m. He told the responding officer that he only saw two people in the truck.

**Arrest of Defendants**

Around 3:00 a.m. on September 12, 2012, both defendants were arrested at Israel Lopez's (Lopez) house.[3] An older model green Chevrolet Silverado SUV was parked in front of the house, and it was registered to Lopez. The vehicle's muffler made a loud and deep noise. Defendant Gonzalez's wallet and identification were found in the driver's door compartment.

---

[2] Given the similarities in last names, we will refer to the victim in count IV as "Francisco" for ease of reference; no disrespect is intended

[3] According to the probation report, the police used the signal from a victim's cell phone, which led them to Lopez's house on McNew Court. This evidence was not introduced at trial.

A grey Buick Regal was also parked in front of Lopez's house. Defendant Castilleja was sitting in the driver's seat. Castilleja had two black Samsung cell phones and a Metro PCS cell phone in his possession. Francisco's knife was found in the sedan.

**Identification of Defendants**

Shortly after defendants were arrested, the police arranged for the victims to participate in separate infield showups just a few hours after the robberies.

An officer drove Garcia to a location for infield showups of Castilleja, Gonzalez, and Lopez. Garcia stayed in the police car while another officer escorted each man past her location. When the officer walked by with Castilleja, Garcia said he was too far away and asked the officer to bring him closer. After she got a closer view of his face, she identified Castilleja as the man who robbed her. She also identified the green truck as the suspect's vehicle. She separately looked at Lopez and Gonzalez, but she did not identify them.

Around 6:00 a.m., while Chavez was being treated at the hospital's emergency room, the police separately escorted Lopez, Gonzalez, and Castilleja past his treatment room for showups. Chavez testified that an officer told him "they caught the ones from the truck, and they were going to show me them." Officer Stratton, who conducted the showup, denied that he made that statement to Chavez, and testified that he told Chavez that the people he was going to see may or may not have been involved in the incident.

Chavez was initially asked to look at Lopez. Chavez said Lopez "kinda" looked like the gunman, but he was not sure. Upon looking at the other two suspects, Chavez immediately identified Castilleja as the driver, and Gonzalez as the passenger and gunman.

A few hours after the robbery, Francisco went to the police station and identified his cell phone. An officer asked Francisco to look at some suspects in a showup. Francisco said he was too scared and refused.

Later that morning, an officer contacted Francisco and asked him to look at the suspects at the police station through a mirrored window, where he would not be seen by the suspects. Francisco agreed and the officer drove him to the station. The officer told Francisco that they had some people who may or may not have been involved in the crime. Francisco looked at Castilleja, Gonzalez, and Lopez in separate showups through a mirrored window.

Francisco said he was certain that Castilleja was the man who robbed him. Francisco looked at Gonzalez twice and did not identify him. Francisco said he was not sure if Gonzalez was involved in the crime. Francisco did not identify Lopez, and said he was certain Lopez was not involved.[4]

---

[4] Francisco was subpoenaed to testify at defendants' trial. The district attorney's investigator testified that Francisco said he would not appear. The investigator arrested Francisco on an outstanding and unrelated misdemeanor warrant. Francisco spent the night in jail, he was ordered to appear at defendants' trial, and he finally testified against defendants.

Francisco testified he never refused to appear at trial. At the time of the robbery, he had outstanding misdemeanor warrants for public intoxication and possession of marijuana. Francisco testified that he asked the district attorney to place him in the witness relocation program because someone had followed him and pulled a gun on him, and he was scared. Francisco testified the district attorney's office lied and reneged on promises to relocate him and dismiss his outstanding warrants.

After Francisco testified about his fear of defendants and his experience with the district attorney's office, defendants moved for a mistrial. Defendants also asserted they had not been informed of any potential deal for Francisco's testimony. The court denied defendants' motion for mistrial.

As a result of this issue, however, it was stipulated that the deputy district attorney had a telephone conversation with Francisco and said he would dismiss a misdemeanor public intoxication charge in exchange for Francisco's agreement to accept a subpoena to testify at defendants' trial; the district attorney also offered to explore the possibility of witness relocation for him; and Francisco was advised that these matters would be disclosed to the defense. It was also stipulated that there was no evidence that defendants or anyone associated with them made any threats against Francisco; and the prosecutor failed to timely disclose Francisco's statements to the defense.

**Defendants' Postarrest Statements**

After the showups, defendants Gonzalez and Castilleja were separately interviewed at the police department.

Officer Stratton met first with Gonzalez in an interview room and advised him of the warnings pursuant to *Miranda v. Arizona* (1966) 384 U.S. 436 (*Miranda*). Gonzalez agreed to answer questions. Gonzalez acknowledged he had an "OB" tattoo that meant the Okie Bakers gang. Gonzalez said he had been a member of the Okie Bakers since he was 13 years old, and his moniker was "Young One." Gonzalez said Lopez was known as "Boogie," and he was also a member of the Okie Bakers.

Gonzalez said Lopez owned the green truck. He said Lopez picked him up in the truck on September 11, 2012, and he stayed with Lopez until the police arrested him later on September 12, 2012.

Stratton then met with Castilleja in an interview room and advised him of the *Miranda* warnings. Castilleja agreed to answer questions, and said that Lopez was known as "Boogie." [5]

Officer Stratton testified that after the interviews, Castilleja and Gonzalez were held in adjacent holding cells that were separated by a wall. Officer Stratton heard defendants talk about whether they were going to jail and who they would see there. Castilleja asked Gonzalez, " 'Who was that fool that we had to stand in front of at the hospital.' " Gonzalez replied, " 'That was the fool from the truck. Remember.' "

---

[5] Veronica Murillo (Murillo) testified defendant Castilleja was her fiancé, and they were together between midnight and 2:00 a.m. on September 12, 2012. Murillo failed to disclose this information until after she had sat in the courtroom and watched defendants' trial for two days, and then talked to Castilleja's attorney. Murillo admitted she had regular telephone conversations with Castilleja while he was in jail. Murillo had a prior felony conviction for vehicle theft in 2010 (Veh. Code, § 10851).

8.

Castilleja replied, " 'Serio?' " Officer Stratton believed that meant, " 'Seriously.' " Gonzalez said, " 'Yep.' "[6]

## Interview With Lopez

Officer Stratton later spoke with Lopez, who acknowledged his nickname was "Boogie." There was a photograph of Lopez with both defendants on Lopez's cell phone. Lopez said Gonzalez was known as "Young One" and Castilleja was known as "Grinch." Lopez had tattoos that said "KC" and the "O" symbol from the Baltimore Orioles. Stratton suspected the tattoos were gang related, and referred to Kern County and the Okie Bakers. He asked Lopez about these tattoos. Lopez said he was a fan of the Kansas City and Baltimore baseball teams, but he did not know anything about the teams or the names of the players.

Lopez said he loaned his truck to defendants that night; he did not go with them; they did not return to his house; and he went to bed.

Yesenia Lara, Lopez's cousin, told the police that Lopez was with her all night and never left the house.

Lopez was released from custody and not charged in this case.

## Trial Identifications

At trial, Chavez testified he only saw the driver and passenger in the truck that pulled up next to his vehicle. He identified Gonzalez as the passenger and the gunman who shot him. Chavez initially testified that he could not recall if there was a third person sitting in the rear cab section. On further questioning, Chavez testified he might have seen a third person in the truck's rear cab.

---

[6] Daniel Chavez was shot while sitting in his parked SUV. He looked at defendants during an infield showup while he was being treated at the hospital for his gunshot wound.

9.

It was stipulated that as Chavez entered the courtroom to testify, he saw Lopez in the hallway and identified him as the third person who was in the truck that pulled up next to his vehicle.

Garcia testified that Castilleja was the gunman who robbed her in her cab. Garcia testified she did not identify anyone as the driver because he was too far away to see his face.

Francisco testified he only saw a driver and a passenger in the truck that stopped next to him as he was walking home. He identified Castilleja as the passenger and gunman who robbed him on the street. He did not really see the driver. He did not notice anyone else in the vehicle.

**Lopez's Trial Testimony**

Lopez testified he owned the green Chevrolet truck. He testified both defendants were hanging out at his house on the afternoon and evening of September 11, 2012. Around 10:00 p.m., Lopez loaned his truck and cell phone to defendants. Defendants left in the truck and said they were going to the store. Lopez did not go with them. Defendants did not return and he went to sleep. The police arrived around 3:00 a.m. on the morning of September 12, 2012. Lopez denied being involved in any gang activity.[7]

**Gang Evidence[8]**

Officer Ryan Vaughn testified as the prosecution's gang expert and explained the Okie Bakers was a criminal street gang that operated in Bakersfield. The Okie Bakers associated with the color blue. It had feuds with the East Side Bakers, Colonia Bakers,

---

[7] The investigating officers testified that some parts of the truck were processed for DNA, but the samples were not tested. There were fingerprints in the truck, but fingerprint comparisons were not conducted because they were of "poor quality to no value."

[8] We will not address the evidence about the gang-related charges in detail since they are not at issue in this appeal. (See, e.g., *In re Jose O.* (2014) 232 Cal.App.4th 128, 131.)

and the Norteños.  The gang's primary activities were weapons violations, murder, assaults with deadly weapons, shootings, robberies, narcotics sales, and burglaries.

Officer Vaughn testified about several predicate offenses committed by members of the Okie Bakers (other than defendants) in 2009 and 2011, which involved drug sales, firearms, and shootings.  Vaughn believed the gang was involved in an ongoing pattern of criminal activity.

Several officers testified about numerous personal contacts with both defendants in 2009, 2011, and 2012, which did not involve arrests.  The officers testified they saw defendants' tattoos signifying the Okie Bakers, and defendants admitted they were members of the Okie Bakers.  Castilleja said his moniker was "Grinch," and Gonzalez said his moniker "Young One."

Officer Vaughn testified that based on his personal contacts with both defendants, their tattoos, and their prior statements, he believed defendants were active members of the Okie Bakers gang in September 2012.  He considered Lopez to be an associate of the gang.

In response to a series of hypothetical questions, Officer Vaughn believed that if two members of the Okie Bakers borrowed a car from an associate of the gang, and they committed armed robberies and fired shots at the victims, the offenses were gang related because robberies and assaults with deadly weapons were among the primary activities of that gang.  Vaughn testified that when a gang member asks, "where are you from," that was a gang-motivated challenge about the other person's presence in a particular area of turf.

**Charges, Verdict, and Sentence**

Defendants were jointly charged with count I, attempted murder of Chavez (Pen. Code, §§ 664/187, subd. (a));[9] count II, discharging a firearm at an occupied motor vehicle, also based on Chavez (§ 246); count III, robbery of Garcia (§ 212.5, subd. (c));

[9] All further statutory citations are to the Penal Code unless otherwise indicated.

11.

count IV, robbery of Francisco (§ 212.5, subd. (c)); and count V, active participation in a criminal street gang (§ 186.22, subd. (a)).

As to both defendants, it was further alleged that a principal personally discharged a firearm causing great bodily injury as to counts I and II (§ 12022.53, subds. (d), (e)(1)); a principal used a firearm as to counts III and IV (§ 12022.53, subd. (b)), with gang enhancements as to counts I through IV (§ 186.22, subd. (b)(1).

It was separately alleged that Gonzalez had one prior strike conviction, and that Castilleja had two prior strike convictions, one prior serious felony enhancement, and a prior prison term enhancement.

After their joint jury trial, Gonzalez was found guilty of count I, attempted murder of Chavez; count II, discharging a firearm at Chavez's occupied motor vehicle, with the gang and firearm enhancements found true; and count V, active participation in a criminal street gang. He was found not guilty of count III, robbery of Garcia, and count IV, robbery of Francisco.[10]

Castilleja was convicted of all counts, and all enhancements were found true.

The court granted the prosecution's motion to dismiss the prior conviction allegations against Gonzalez. It found all prior conviction allegations true as to Castilleja.

Gonzalez was sentenced to the upper term of nine years for count I, plus 25 years to life for the firearm enhancement; the court stayed the terms for the other counts. Castilleja was sentenced to an aggregate term of 100 years to life plus 35 years.

---

[10] As explained above, Chavez was the only victim who identified both defendants, as charged in counts I and II. Neither Garcia nor Francisco positively identified Gonzalez as one of the suspects in the robberies charged in counts III and IV.

12.

## PROCEDURAL HISTORY OF
## THE COURT'S DECISION TO REMOVE JUROR NO. 7

Defendants' primary issue on appeal is whether the court improperly excused Juror No. 7 for misconduct during deliberations.

In order to address this issue, we will review the procedural history of deliberations, the jury's notes to the court, and the court's decision to question all the jurors, which led to the court's decision to excuse Juror No. 7 and find she committed misconduct.

### Deliberations Begin

On July 23, 2013, defendants' joint jury trial began.

On August 6, 2013, the jury began deliberations.

On the morning of August 7, 2013, the court advised the parties that it had just received a note from the jury dated the previous afternoon. The note asked to hear Rosa Garcia's testimony about her identification of Castilleja. The court and the parties agreed that the reporter would read Garcia's entire testimony to the jury.

### The Foreperson's Note

At 2:30 p.m. on August 7, 2013, the court stated that it had received two notes at 1:55 p.m., signed by the foreperson (Juror No. 2). The first note asked to hear Daniel Chavez's testimony about the identification of both defendants. The court and the parties agreed that Chavez's entire testimony would be read to the jury.

The court turned to the foreperson's second note, which stated:

> "In the case where a juror is using 'life experience' and claims to have been treated wrongly by police in the past and refuses to believe police officers' testimony, what is the rest of the jury to do?"[11]

---

[11] Juror No. 7 later said she never saw this note.

The court was concerned that a juror was using outside information that was not evidence, and not complying with the instructions. The court wanted to reread certain instructions to the jury relevant to its note.

The prosecutor asked the court to determine which juror was using "life experiences" to decide the case, and remove that person from the jury. The prosecutor was concerned because these were issues which were addressed during voir dire, and "a juror so disposed [was] not being truthful during multiple occasions" when the prospective jurors were asked about bad experiences with law enforcement.[12] The prosecutor argued that all the jurors were asked about their abilities to treat the testimony of officers the same as any other witness but, based on the foreperson's note, this particular juror "patently can't, won't, and refused to tell us when that person had the opportunity" during voir dire.

Gonzalez's attorney argued it would be inappropriate to single out this juror and ask any questions, because it would affect that juror's ability to continue deliberations. It was appropriate for a juror to use his or her common sense and life experience, and the note implied that it was written by someone who simply disagreed with this juror. Castilleja's attorney agreed that it was appropriate for a juror to rely on his or her common sense, and believed it was inappropriate for the foreperson to interfere with deliberations by writing this note.

The court said it was reluctant to "reach into the jury room" and involve itself in deliberations, and decided the appropriate remedy was to reread certain jury instructions.

### *The Court Reinstructs the Jury*

At 2:44 p.m. on August 7, 2013, the jury returned to the courtroom. The court stated that Chavez's testimony would be read to them. The court then addressed the

---

[12] The appellate record does not include the voir dire transcript.

14.

foreperson's second note, about using "life experience," and asked if all the jurors had seen the note. Juror No. 7 (No. 3053202) said no.

The court read the foreperson's note aloud, and said it was going to reread some instructions to respond to the question. The court reinstructed the jury with CALCRIM No. 200 (duties of judge and jury), No. 226 (witnesses), and No. 3550 (pre-deliberation instructions), and instructed the jury to continue deliberations.

**Juror No. 7's First Note**

At 3:30 p.m. on August 7, 2013, shortly after the court reinstructed the jury, it received another note, which was signed by Juror No. 7. The note stated:

> "Honor I feel the other jurys [*sic*] are trying to gang up on me to change my mind. I feel this is unfair. And I am not letting them bully me into change my verdict."[13]

The court decided to question Juror No. 7 and determine whether she was deliberating. Depending on her responses, it would decide whether to question the other jurors. "If [Juror No. 7] is deliberating but she's simply not changing her mind and she is not exhibiting bias against anyone and is considering only the evidence and the law through jury instructions, then that's just the way it is." The parties agreed.

### *Juror No. 7*

The court questioned Juror No. 7 outside the presence of the other jurors. The court advised Juror No. 7 that it read her note, and it wanted to ask a few questions. The court said there were no wrong answers, it was not going to put any pressure on her, and it did not want to know any verdicts or personal votes. The court asked if she had a chance to discuss the facts of the case with the other jurors.

Juror No. 7 said she could not express her viewpoint openly and honestly because the other jurors were not agreeing with her. The court asked if she was considering

---

[13] This handwritten note was dated "7/7/13," but it was file-stamped August 7, 2013.

15.

anything other than the evidence, and applying the law and her common sense and experience. Juror No. 7 said she was using her "life experience."

The court reminded Juror No. 7 that she was instructed to judge each witness based on the same standard. She said she had done that. The court asked if she continued to discuss the case with other jurors. Juror No. 7 said no, that other jurors were "just ganging up on me." Juror No. 7 said the other jurors told her that she was "biased." The court explained that she could use her life experience, but she could not be biased. Juror No. 7 said she understood, and she would continue deliberating.

### *The Court's Discussion with the Parties*

The court said it did not appear that Juror No. 7 was failing to deliberate, or using her life experiences to prevent her from judging each witness by the same standard. The court believed Juror No. 7 disagreed with other jurors, the other jurors were expressing their opinions as part of the deliberations, and Juror No. 7 felt intimidated.

The prosecutor asked the court to question the foreperson to see if that person could improve the quality of Juror No. 7's deliberations. Both defense attorneys disagreed and argued that the other 11 jurors were acting inappropriately to prevent Juror No. 7 from expressing her opinions.

The court decided to question the foreperson since that juror wrote the first note about the situation, to determine whether Juror No. 7 was being pressured.

### *The Foreperson (Juror No. 2)*

The court asked the foreperson if there had been an opportunity for each juror to be heard. The foreperson said yes. The court asked if anything happened to prevent Juror No. 7 from expressing her viewpoints. The foreperson said no, and there had been an open and honest discussion. The court asked if the jurors had discussed the instructions, and what could and could not be considered. The foreperson said yes.

The court asked the foreperson that if it ordered the jury to resume deliberations, whether the foreperson would feel comfortable to remind everyone to have an open discussion and allow each person to be heard. The foreperson said yes.

### *The Court Reinstructs the Jury*

After questioning the foreperson, the court told the parties it would reread part of CALCRIM No. 3550. The prosecutor said that based on the statements by the foreperson and Juror No. 7, there was not enough evidence to support his earlier motion to remove Juror No. 7 at that time. The court agreed.

The court called the entire jury into the courtroom and re-read a portion of CALCRIM No. 3550:

> "And this is for everyone. I'm not singling anyone out. It's for all 12 of you. [¶] Keep an open mind and openly exchange your thoughts and ideas about this case. [¶] Stating your opinions too strongly immediately or at any time or announcing how you plan to vote immediately or too strong may interfere with an open discussion. [¶] Please treat one another courteously. Your role is to be an impartial judge or the facts, not to act as an advocate for one side or the other.
>
> "All right. So everybody has a chance to be heard, listen to everyone. Whether you agree or not, it's up to you, and that's whatever happens in the jury room. But an open discussion includes listening to whatever someone else's point of view is.
>
> "And, again, as you've been instructed, I don't need to read it to you again. You have the instructions. Just go back, talk about the case, apply the law to the facts, and do what you do."

The jury resumed deliberations.

## Juror No. 7's Second Note

On the morning of August 8, 2013, the court advised the parties that it had received two notes from the jury. The first note was from the foreperson and asked to hear Sergeant Stratton's testimony about the conversation between defendants in the holding cells. The court and the parties agreed that the entirety of Stratton's testimony would be read to the jury.

17.

The court said that about 20 minutes after the foreperson's request for Sergeant Stratton's testimony, the court received the following note from Juror No. 7.

> "The foreman has told me that she diffently [*sic*] this I am byhass [*sic*]. I voted to get a new foreman. I don't feel I am being bias and I don't think the foreman has that right to determine I am bias or not for using my personal knowledge. One should not be consider bias because I explain my personal experience. I am not joining with the major."[14]

The court decided to again question the foreperson and Juror No. 7, and perhaps question the entire jury depending on their responses. The prosecutor again moved to remove Juror No. 7 and replace her with an alternate. The prosecutor argued that Juror No. 7 violated her oath and the instructions because she was deciding the case based on her own personal bias. Both defense attorneys argued the other jurors committed misconduct by placing pressure on Juror No. 7 because they disagreed with her. Defendants moved for a mistrial and to discharge all the jurors based on their alleged misconduct toward Juror No. 7.

The court declined to address the parties' various motions until it interviewed Juror No. 7 and the foreperson again, and decided whether to interview the other jurors.

### *Juror No. 7*

The court began by questioning Juror No. 7 about her second note. Juror No. 7 said the foreperson accused her of being biased because she was using her personal experience. The court asked what type of personal experience that she was relying on. Juror No. 7 said she had worked for the military and the government since she was 18 years old. She had worked for the Department of Corrections for 13 years. The court recalled that she disclosed that during voir dire. Juror No. 7 said, "So why I … be bias against police officers or law enforcement?"

---

[14] This handwritten note was also dated "7/7/13," but was stamped August 8, 2013.

The court asked Juror No. 7 whether she had used her "special knowledge or experience" to judge the witnesses, instead of considering the evidence. Juror No. 7 said no.

Juror No. 7 said the other jurors were cutting her off from making comments. She told the foreperson that she was not biased against law enforcement, and the foreperson said she was. The court asked Juror No. 7 if she could express her opinions. She said no, because the other jurors "all gang[ing] up on me." She was judging the credibility of each witness by the same standard. Juror No. 7 said she could keep deliberating, but asked the court to talk to the foreperson.

The court asked Juror No. 7 if she had negative personal experiences with law enforcement and talked about it with the jurors. Juror No. 7 said yes, there was one incident, and she told the jurors what happened to her. The court asked if she used that negative experience to judge the credibility of any witnesses. Juror No. 7 said yes. She believed she was racially profiled by the police in Rosedale three times and pulled over for no reason, "other than they've seen a Hispanic in Rosedale."

> "[THE COURT]: Okay. And how is that factored into your evaluation of the witnesses?

> "[Juror No. 7]. Because I thought one of them was not credible. And so they said, well, you know, he's law enforcement and that they can't make any mistakes, and I felt that was."

The court thanked Juror No. 7 and asked her to step out. The court asked the parties for their reaction. The prosecutor again argued Juror No. 7 should be removed. Defendants replied that Juror No. 7 simply had a different opinion from the other jurors based on her own life experience, and the other jurors prevented her from expressing it. Defendants again argued the other jurors were committing misconduct and not Juror No. 7.

The court decided to question the foreperson again.

19.

### *Juror No. 2 (the Foreperson; No. 2994347)*

The court asked Juror No. 2 whether he/she told Juror No. 7 that she was biased, or made this accusation to anyone else. Juror No. 2 said yes. Juror No. 2 said that Juror No. 7 did not believe any of the prosecution witnesses. Juror No. 7 stated her opinions about what she thought might have happened without any factual basis. Juror No. 7 did not like how the case was investigated.

Juror No. 2 said, "[W]e read our instructions. We've explained the instructions. And [Juror No. 7] does not want to follow the instructions. She says, 'Well, from my personal experience, my life experience, this is what I think.' " Juror No. 2 said that, as to more than one witness, Juror No. 7 "says based on her life experience, … she doesn't believe the direct testimony. She doesn't believe what they say, what they saw – what they say that they saw. She doesn't believe it." Juror No. 2 said Juror No. 7 had an opportunity to express her opinion without being cut off.

The court asked Juror No. 2 about the type of personal experiences discussed by Juror No. 7. Juror No. 2 said that Juror No. 7 said she had been profiled by the police in Rosedale on three different occasions, but she did not articulate how she used that information to decide the credibility of the witnesses.

After speaking with the foreperson, the court decided to separately question each juror. The court began the questions by generally asking each juror about deliberations, and did not specifically ask about Juror No. 7. As we will explain, nearly all the jurors brought up Juror No. 7's statements and comments on their own accord, and then the court asked follow up questions.

### *Juror No. 1 (No. 2831120)*

The court asked Juror No. 1 if each juror had been able to express his or her opinion. Juror No. 1 said it was hard because Juror No. 7 was "making it a little bit complicated and hard for all of us. It's just going in a circle." Juror No. 7 said she had worked "for years" in Department of Corrections and with officers, and had experiences

being pulled over in Rosedale because she was in the wrong area. Juror No. 7 was using her "life experience" and could not come up with a solid conclusion or decision. Juror No. 1 said some of the jurors were "a little bit impatient" with Juror No. 7, but they had been patient and did not bully her in any way.

The court asked if Juror No. 7 said anything about disbelieving the witnesses based on her life experience. Juror No. 1 said yes, and Juror No. 7 said " 'I don't believe the cops. I don't believe anything they say. I don't believe this witness because he was – there was an agreement because he got paid or he had a room to stay in.' For some reason she doesn't – because of this special treatment, she thinks he's – or she thinks that he's not a credible witness."[15]

### Juror No. 3 (No. 3064567)

Juror No. 3 said that a juror had a bad experience, and told the other jurors that "law enforcement lies," and " 'I know the cops lie.' And then they said that they *know* the law." (Italics in original.) Juror No. 3 said that juror said "they knew how the law worked specifically." That juror had been cut off during "back and forth and in conversation" with other jurors.

### Juror No. 4 (No. 2921648)

Juror No. 4 said Juror No. 7 talked about "profiling done in a couple of cases of them traveling through Rosedale," and also expressed "a knowledge of the law outside of the law that we were to put into this case." Juror No. 7 said she knew the law because she worked for the county, and she had "worked in areas where … she had gotten the knowledge of the law." Juror No. 7 said it "in a way where her knowledge of the law superseded the jury instructions that we had."

"[W]e discussed the jury instructions. And it is my understanding that we can use our personal experiences and good judgment to evaluate the

---

[15] Chavez, the victim in counts I and II, testified he received gas money, a witness fee, and a paid hotel room in order to testify.

evidence.  What I am seeing is that personal experiences are being used *as* evidence.  And we all haven't had the same personal experiences."  (Italics in original.)

Juror No. 4 said that Juror No. 7 talked about profiling and "that law enforcement is not always truthful.  And that – a disagreement in the way some of the evidence in this case was gathered."  Juror No. 7 appeared to dismiss witness testimony "according to feeling rather than according to any evidence."  Juror No. 4 believed "our life experience is not evidence and our good judgment is not evidence.  And that's a disagreement that I have with the way the proceedings are going in our deliberations."

### *Juror No. 5 (No. 3008594)*

Juror No. 5 said that Juror No. 7 mentioned having "some experiences with law enforcement in regard to stereotyping and things like that."  Juror No. 7 said she judged the credibility of witnesses based on her experience of being stereotyped, "pulled over or stopped … by an officer just because she was in the wrong neighborhood or something like that."  Juror No. 7 "was trying to state that officers make mistakes a lot – or sometimes" and "that just because it's an officer, it's not always – you know, just because it's an officer doing it or saying it doesn't always mean that they're right."

Juror No. 5 said that Juror No. 7 "mentioned that … she knows the law" because "of the occupation that she's involved with" in the Department of Corrections.

> "[S]he mentioned that she knows the law because she works with a lot of correctional officers….  [¶]  Now, in regard to why she felt like just because she works with correctional officers she knows the law, I'm not sure why she – she would think just because she works with correctional officers that she has a better knowledge of the law."

The court asked Juror No. 5 if he/she felt that Juror No. 7 was using her "knowledge of the law, in any way outside of the directions of the jury instructions?"  Juror No. 5 said yes, that "she's using more of her opinion or experience, personal experience with the law versus the evidence laid before us."

22.

### *Juror No. 6 (No. 3079231)*

Juror No. 6 quoted Juror No. 7 as saying, " 'Well, my past experience from police, you know, I've been profiled in the past and I have issues with police. I have issues with how the police testified.' " Juror No. 7 made this statement about all of the law enforcement witnesses. Juror No. 7 also said "she knows the law because she has worked on that side of the field before. So she knows what the law should be."

The court asked Juror No. 6 for his/her reaction to Juror No. 7's statement about the law. Juror No. 6 replied: "I really just disregarded it," and he/she had "tune[d] it out now until we're actually able to talk all as human beings civilly." The court asked Juror No. 6 if each juror had been able to speak without being ridiculed or shouted down. Juror No. 6 said no one had been ridiculed or bullied.

### *Juror No. 8 (No. 2892126)*

Juror No. 8 said everyone had an opportunity to express themselves. However, Juror No. 7 "mentioned that she's had good and bad, but she keeps on bringing, you know, the part that she's been profiled, which I don't – in my opinion, has nothing to do with what we're doing here." Juror No. 7 did not say whether she used those personal experiences to judge the credibility of witnesses. However, she kept "mentioning that she knows the law" and "she deals a lot with law enforcement."

> "THE COURT:     Do you have an impression one way or the other or not at all as to whether her statement that she knows the law is in any way being utilized as opposed to using the jury instructions, or in conjunction with using the jury instructions?
>
> "[A.]  I think so.
>
> "THE COURT:     Okay. Explain that to us, please.
>
> "[A.]  Just the way she comes across with, like I said, she just keeps on going in circles, saying that she knows the law but she doesn't elaborate any. [¶] She, to me, sounds like, to a certain extent, sounds like she's biased as to law enforcement."

The court asked Juror No. 8 to explain:

23.

"In my opinion, you know, she's mentioned that all the officers that she's been – she's listened to. In her words, she doesn't believe a word they say. And then when we ask her why, she just says that she knows the law, but she doesn't elaborate on how she knows the law. So it's – it's just going around in circles."

### *Juror No. 9 (No. 3065321)*

Juror No. 9 said everyone had an opportunity to express their opinions. Juror No. 7 talked about her experience with law enforcement, "along the lines of being … prejudiced against herself in a certain area of town." Juror No. 7 also brought up the fact "that in her experience, she would have tested for gunpowder residue. And we tried to tell her, you know, that we were all instructed that we're not supposed to use evidence that isn't brought to us and a report that was never used in this case. So I took it as we were supposed to act like we didn't even know what that is." "And so it's things like that. You know, she just kept saying in her experience what she would have done. And so we just kind of – like she was basing it on that, not what was in front of us."

According to Juror No. 9, Juror No. 7 also said:

"She said that, I guess, if you take any three random people, no matter who they are, as long as they're all the same race, basically, that it would be easy to pick out who you think did it, I guess, because something along the lines of people who look, you know, similar.

"And so her thing was basically that since she's been profiled before and prejudiced against, she feels that the cops will just use anybody to close their case."

Juror No. 9 said that Juror No. 7 said "basically that she thinks cops are liars and that she doesn't believe any of their testimony." Juror No. 9 said the other jurors repeatedly asked "if she meant, not just the police, but all witnesses? And she said she didn't believe anybody. Nothing they had to say. [¶] And then when we specifically said, the police? She said no. That's when she said that they – you know, that they lie about it and how they can be prejudiced against people and all that."

Juror No. 9 continued:

"[Juror No 7] kept saying about the laws regarding evidence. You know, like I said, things she said that – she kept saying that the – she thinks it's the law to test for, like I said, the gunshot residue. And so she thinks that because that law wasn't followed or something like that – I don't know, whatever her reason for – for that, she said. [¶] …[¶] She was saying that the law – I guess you could say the law enforcement should know to test for gunshot residue, and because that wasn't in this case, she feels that basically, I guess it was like, she kept saying the word *botched*. That the case was botched because of that. And that it was just – like she said, the police just trying to close their case." (Italics in original.)

Juror No. 9 said that Juror No. 7 kept saying "that she felt she had knowledge of what should have been done [in] the lineup." She kept "bringing up that there was only three. That there should have been more than three. And because there was only three, that's why she thinks that it was sloppy police work and that it was all botched."

"She kept saying her personal experience. That's what she kept saying. She kept saying, 'Through personal experience, I know there should be a six-pack of pictures and that it shouldn't be just an in-face lineup and that it was all done wrong.' And she kept saying – she said that because she had dealt with that herself before."[16]

Juror No. 9 said Juror No. 7 talked about working for either the military or corrections, and that was why "she knew what she knew."

### Juror No. 10 (No. 3097979)

Juror No. 10 said the jury had been discussing "another juror's personal opinions and trying to get through those issues instead of going through the facts." That juror said "she had bad experiences with [law enforcement] and that she wants to dismiss all the officers' testimonies" because of her bad experiences. The juror said she had been singled out. She also said "she knew the law" and "she works with the law." Juror No. 10 was waiting for her to explain what she meant, "but she really never had a point to

---

[16] Both defense attorneys extensively cross-examined the victims and the officers about the infield showups, and the officers' failure to conduct photographic or live lineups.

it." The juror said she was not going to believe the facts or law of the case "because of what she's seen in her history."

### *Juror No. 11 (No. 3057295)*

Juror No. 11 said Juror No. 7 talked about an incident where "she felt she was profiled," and said that she had been profiled by the police on three occasions. "She said the police – she stated that because of how she was treated, she feels that – that the way they said, the way the officers testified that they handled the situation was not true." Juror No. 7 said "she didn't believe any of the officers" because of her " 'life experience.' "

Juror No. 7 kept repeating, " 'Do any of you know the law? Because I know the law.' " Juror No. 7 said she worked around law officers, and "she knew how some of them were bad and some were not. But she said that's why she's not believing any of the officers, their testimony."

> "[T]here was an exchange going on where we were simply trying to read the instructions. That we are simply to follow – I think there was a portion that states in there that we have to go by your instructions. And she would state back that, 'Well, I know what I know.' "

### *Juror No. 12 (No. 2958230)*

Juror No. 12 said that Juror No. 7 told the jurors that she had been profiled twice by the police. Juror No. 7 continually talked about how she had been racially profiled by the police. Juror No. 7 claimed the police "could have pulled any three Hispanic men off the street and … we would have gotten the same … that one of them would have been identified." One of the jurors asked Juror No. 7 "which one of the prosecution witnesses were credible. And her answer was she believed that none of them were credible."

The court asked Juror No. 12 if Juror No. 7 talked about her knowledge of her law. Juror No. 12 said she only talked about "the law that you gave us. She didn't really talk about, in my opinion, anything that was anything … that was outside of what you had told us."

26.

**The Parties' Arguments**

After the court concluded questioning the jury, the prosecutor renewed his motion to remove Juror No. 7 and replace her with an alternate.

Gonzalez's attorney moved for a mistrial based on the conduct of the other jurors toward Juror No. 7. Castilleja's attorney argued there was no evidence that Juror No. 7 disbelieved all the witnesses based on bias. Castilleja also argued a mistrial should be declared because there was no way for this jury to continue deliberating after this conflict.

**The Court's Denial of Motion for Mistrial and Decision to Excuse Juror No. 7**

The court denied defendants' motion for mistrial. It did not find that any of the jurors "with the exception of No. 7 have engaged in any conduct that is prohibitive of frank and open discussions as instructed pursuant to the jury instructions," or refused to deliberate.

The court granted the People's motion to excuse Juror No. 7 and replace her with an alternate, and made detailed findings.

> "The best summation of what's been going on in the back is probably what has been articulated by Juror No. 4. Not only has Juror No. 7 improperly used her distrust of law enforcement, but she's done so in a way that is prohibited. It is not simply that she has had some negative experiences with law enforcement and based on that she is using those life experiences in regard to judging the credibility of a witness or witnesses, *but she has exhibited a blanket distrust of law enforcement and of all witnesses called by the prosecution based upon that*.
>
> "But probably most importantly, she has repeatedly stated that she knows the law. She's stated this is what she would do. She stated she knows the law, do you?
>
> "She's indicated, as articulated by two of the other jurors, Jurors No. 3 and 4, said that *Juror No. 7 said she knows the law and was using that improperly*.
>
> "Juror No. 5 said that.
>
> "Juror No. 6 said she knows the law and knows what it should be.

27.

"Juror No. 7 – excuse me.

"Juror No. 8 said Juror No. 7 knows the law and disbelieves all witnesses.

"Juror No. 9 said Juror No. 7 said all cops are liars. And what the law should be in regard to testing gunshot residue.

"This is distinguishable from a juror saying, 'Gee, it would be nice if this other information was provided. I'm not considering something outside the evidence, but I can consider that there is a lack of evidence in a certain area.' That's certainly permissible.

"But injecting one's personal experience in regard to law enforcement or in regard to Corrections and that if I was law enforcement, I would have done this or that, is not permissible. That's outside the evidence and is impermissible.

"Juror No. 10 indicated that Juror No. 7 dismissed all the officers' testimony because Juror No. 7 knows the law.

"Juror No. 11 stated that Juror No. 7 said she didn't believe any of the officers. And that Juror No. 7 said she knows the law. 'I know what I know.'

"Juror No. 11 talked about the in-field showups and said Juror No. 7 said, hey, if you put three Hispanics up there, one of them is going to get identified. And stated that Juror No. 7 didn't find any of the witnesses credible.

"Unlike referenced by one or both defense counsel, inquiry was made, at least of Juror No. 2, and I believe in a different way of some other jurors, as to what was the sequence of Juror No. 7 referencing her negative experiences with law enforcement.

"There is good cause to discharge Juror No. 7. It is based on the record. And the record does reflect the appropriate grounds for discharging Juror No. 7

"There is a demonstrable reality.

"She has exhibited bias against law enforcement.

"*She has refused to follow the law in that she's injected her own understanding of the law and her own beliefs as to what the law says*

28.

*particularly*, but not limited to, her discussion of when six-packs and in-field showups should be done, et cetera." (Italics added.)

The court said it was not making this decision lightly, but had carefully considered everything it had heard.

> "It is not something that I like to do and I frankly have never been presented with these facts in this egregious example before that would necessitate removing a sitting juror. But that's the fact in this case, and this is the remedy to ensure that all three sides have a fair decision-maker if the jury can reach a decision.
>
> "In addition, I have carefully considered what inquiry to have taken and take of the jurors in this regard and only engaged in the inquiry when necessitated by jury notes."

## Excusal of Juror No. 7

The court asked Juror No. 7 to return to the courtroom, and advised the juror: "We'd like to thank and excuse you for your jury service. We appreciate the time that you have been here with us. We wish you the very best of luck."

Juror No. 7 replied: "Okay. Am I to believe that because I'm against all the other jurors I'm being dismissed?"

The court said that was not the reason. Juror No. 7 responded, "That's not – because they think they're guilty and I think they're not." The court again said that was not the reason. Juror No. 7 left the courtroom.

The court called the rest of the jurors into the courtroom, and said that Juror No. 7 had been excused but not because of any of her opinions. The court explained that an alternate would be seated the following morning, at which time the jury would "start all over again" on their deliberations for the charges and enhancements. "So if you've already gone through some of it, you have to start as if you just finished closing arguments and we just sent you back to the jury room." The court again said that Juror No. 7 was not excused based on any opinion on the issues in the case, and the reason was irrelevant to the jury's deliberations "because you're starting all over again tomorrow morning."

29.

**Defendants' Renewed Motion for Mistrial**

At 9:00 a.m. on August 9, 2013, the court convened outside the jury's presence. Castilleja's attorney renewed his motion for mistrial, and argued "the sanctity of this jury" could not be preserved after the court questioned every juror. Counsel argued that after the jurors had attributed certain statements to Juror No. 7, the court should have again questioned Juror No. 7 to determine whether she actually made those statements.

The court denied the renewed motion for mistrial, and noted that multiple jurors cited Juror No. 7's statements about knowing the law because she worked in law enforcement. It did not believe further inquiry was needed.

The court seated the alternate juror, and instructed the jury to begin deliberations anew.

**Further Discussion About Juror No. 7**

At 11:00 a.m. on August 9, 2013, the court convened outside the jury's presence and advised the parties that the jury wanted to hear Daniel Chavez's statement.

The court also stated Juror No. 7 had appeared in the courthouse that morning, even though she had been excused from the jury the previous day. Juror No. 7 handed out sealed envelopes addressed to the court, the prosecutor, and both defense attorneys. The court did not open the envelope it received. It asked the jury commissioner to review the contents, and he advised the court that it did not contain any threats. The prosecutor and both defense attorneys said they had not read the contents of the letters. Castilleja's attorney said that a member of his client's family handed the envelope to him.

The court stated there had been a disturbance the prior afternoon, after Juror No. 7 was excused; and another disturbance that morning, when Juror No. 7 entered the courtroom, threw down the envelope, and said, " 'You've been served.' " The court was concerned there was some attempt to inappropriately influence the jurors. The court stated Juror No. 7 was welcome in the courtroom as long as she behaved herself like anyone else, and did not contact the jury.

30.

**Verdict**

On August 12, 2013, the jury returned the verdicts. As explained above, Castilleja was convicted of all counts; all four victims identified Castilleja as either the gunman or driver in the offenses. Gonzalez was convicted of counts I and II, based on Chavez's positive identification of him; and count V, active participation. Gonzalez was found not guilty of counts III and IV, the robberies of Garcia and Francisco; neither victim identified him as one of the suspects in those crimes.

**Motion for New Trial & Juror No. 7's Written Statement**

Castilleja filed a motion for new trial, and argued his rights to due process, a fair trial, and a jury trial were violated when the court removed the "lone hold out Juror No. 7." Castilleja argued the other jurors committed misconduct and bullied Juror No. 7, and the court should have granted his motion for mistrial.[17]

### *Juror No. 7's notarized statement*

Castilleja's motion was supported by a three-page typed statement signed by Juror No. 7. The statement was not dated, but it was notarized on August 19, 2013.[18]

Juror No. 7 wrote that before the jury began deliberations, Juror No. 9 used a cellphone to obtain information from the Internet about whether the tape-recordings introduced into evidence were legal, and shared that information with the rest of the jury.

---

[17] Gonzalez did not join in Castilleja's motion for new trial; his defense attorney stated there was no additional evidence to support a new trial motion, and he intended to seek appellate review of the court's denial of his motion for mistrial after Juror No. 7 was excused.

[18] According to the prosecution's opposition to the new trial motion, Juror No. 7 "submitted a signed, notarized affidavit to the court and each counsel after she was removed from the jury panel." The prosecutor believed defendant's new trial motion was based upon the same statement. Juror No. 7 was removed on August 8, she handed letters to the court and the attorneys on August 9, and her statement submitted in support of Gonzalez's new trial motion was notarized on August 19, 2013. It is not clear whether the notarized statement was identical to the one which Juror No. 7 distributed the day after she was excused from the jury.

Juror No. 7 felt this constituted "gross juror misconduct" since the court instructed them not to consult outside sources.

Juror No. 7 also stated that another juror disclosed information obtained from the news, even though Juror No. 7 admonished the juror that they were not supposed to watch the news.

Juror No. 7 said that during deliberations, she felt the prosecution and the police made numerous mistakes, the testimony from the witnesses contradicted earlier statements, the defendants' clothing was never tested for DNA evidence, and photographic lineups should have been used and would have been more reliable. Juror No. 7 also had issues with two witnesses receiving "substantial consideration" in exchange for their testimony.

Juror No. 7 stated that when she expressed these doubts, she was "berated by other members of the jury who recalled trial testimony incorrectly." The other jurors challenged the accuracy of her notes, and said she could not consider the prosecution's failure to conduct DNA tests on defendants' clothes. Juror No. 7 stated Juror Nos. 2, 4, and 9 prevented her from expressing her opinion, they did not allow her to talk, and they accused her of making up her mind.

Juror No. 7 said that when the judge spoke to her, he said she could consider her life experiences during deliberations. "Despite this admonishment by the Judge that I can use my life experience during deliberation, I was told by the other jurors that I could not as it was not in evidence in trial. I was accused by Juror No. 2, the jury foreperson that I was biased in front of all the other jury members. I used my life experiences to express that police officers are human, that they make mistakes, and that their testimony is no more reliable or believable just because they wear a uniform. I reminded the jurors that a police officer admitted to making a false statement on his report during cross-examination. I was told by jurors that I was biased and could not consider my life experiences during deliberations."

Juror No. 7 said that before she was excused from the jury, several jurors "repeatedly and relentlessly" attacked her character and her "not guilty" vote on the attempted murder charge, and demanded she restate her reasoning. Juror No. 7 said that one juror demanded they continue deliberating, and that juror wanted to finish that day even if the jury was hung.

Juror No. 7 said the foreperson accused her of being biased in front of the other jurors. When she took a smoke break, one juror followed her to make sure she was not meeting with anyone from defendants' families. Juror No. 7 said that on the day she was dismissed from the jury, one juror said "the process needed to be concluded on that day because he did not want to return for another day of deliberations."

The prosecutor filed opposition to the new trial motion, and argued Juror No. 7's statement appeared to have been "written by someone looking for payback after being 'jilted' by the system." Also, Juror No. 7's allegations of misconduct were not credible since she did not raise them when the court questioned her.

**The Court's Denial of Motion for New Trial**

The court denied Castilleja's motion for a new trial, and again found that Juror No. 7 was properly excused because she violated her oath and exhibited bias.

The court addressed Juror No. 7's notarized statement, and stated that it would not consider the thought-processes of the jurors as limited by Evidence Code section 1150. The court noted that Juror No. 7 had alleged that one juror had used the Internet to obtain information about the case, and another juror had watched the news. The court stated these accusations were vague and unspecific.

The court also doubted Juror No. 7's credibility. The court noted that Juror No. 7 had been questioned twice. During the second examination, just before Juror No. 7 was excused, the court gave her "ample opportunity" to talk about any of her concerns about the other jurors, and asked her if she wanted the court to talk to the other jurors about anything. Juror No. 7 only said that she wanted the court to talk to the foreperson. She

never claimed that other jurors were consulting outside sources or engaging in any misconduct.

The court also discussed Juror No. 7's conduct after she was excused:

"In this situation it does appear that Juror No. 7, who was excused based on her behavior in court and, particularly, her behavior out of court where she − first of all, in court when she was excused, and prior to that I had admonished her, 'Do not tell me, or anyone else in the courtroom, what the status of the vote is.' And she said, 'Okay,' and acknowledged that.

"And when she was excused, the first thing out of her mouth was something along those lines, directly in violation of what I told her not to do.

"She then proceeded out into the hallway. She did not want to leave the courthouse. She made efforts to contact other jurors. And then we have this Affidavit a few weeks later where she is bringing up issues that she had the opportunity to address in court and she never addressed."

The court found no evidence of juror misconduct to support a new trial and denied the motion.

## DISCUSSION

### I. Removal of Juror No. 7 During Deliberations

On appeal, Castilleja, joined by Gonzalez, argue the court erroneously discharged Juror No. 7 during deliberations because the record does not show by a demonstrable reality that she was biased or refused to apply the law as instructed by the court. Defendants argue that a juror is permitted to rely on his or her own experiences to assess the credibility of witnesses. Juror No. 7 properly relied on her prior experience of "being profiled to illustrate a point—that police officers can make mistakes and that they are not always truthful," and to doubt the veracity of the identification procedures used in this case. Defendants argue there was no evidence that Juror No. 7's credibility determinations were not based on the evidence and "the significant deficiencies in the way the case was investigated."

34.

We have already reviewed the procedural history leading to the court's decision to excuse Juror No. 7. We now turn to the well-recognized legal principles applicable to this issue.

## A. Discharge of a Juror During Deliberations

"As soon as a jury is selected, each juror must agree to render a true verdict ' "according only to the evidence presented … and *to the instructions of the court*." ' [Citation.]" (*People v. Williams* (2001) 25 Cal.4th 441, 448, italics added in original.) "A juror's duty is to weigh the evidence and credibility of witnesses with impartiality and to reach a fair and unbiased verdict. [Citations.]" (*People v. Thomas* (1990) 218 Cal.App.3d 1477, 1484.)

"[T]he jury must follow the court's instructions, 'receiv[ing] as law what is laid down as such by the court.' [Citation.]" (*People v. Engelman* (2002) 28 Cal.4th 436, 442 (*Engelman*).) A juror who is "actually biased," who refuses to follow the court's instructions, or who refuses to deliberate "is unable to perform the duty to fairly deliberate and thus subject to discharge. [Citations.]" (*People v. Barnwell* (2007) 41 Cal.4th 1038, 1051; *People v. Williams*, *supra*, 25 Cal.4th at p. 448; *Engelman*, *supra*, 28 Cal.4th at p. 442.)

"The trial court may discharge a juror for good cause at any time, including during deliberations, if the court finds that the juror is unable to perform his or her duty. [Citation.] 'When a court is informed of allegations which, if proven true, would constitute good cause for a juror's removal, a hearing is *required*. [Citations.]' [Citation.] If the trial court has good cause to doubt a juror's ability to perform his duties, the court's failure to conduct a hearing may constitute an abuse of discretion on review. [Citations.] 'Grounds for investigation or discharge of a juror may be established by his statements or conduct, including events which occur during jury deliberations and are reported by fellow panelists. [Citations.]' [Citation.] (*People v. Lomax* (2010) 49 Cal.4th 530, 588 (*Lomax*), italics in original.)

"Great caution is required in deciding to excuse a sitting juror." (*People v. Allen and Johnson* (2011) 53 Cal.4th 60, 71.)  "[T]he court may not discharge a juror for failing to agree with the majority of other jurors or for persisting in expressing doubts about the sufficiency of the evidence in support of the majority view [citation] …." (*Engelman*, *supra*, 28 Cal.4th at p. 446.)  "The circumstance that a juror does not deliberate well or relies upon faulty logic or analysis does not constitute a refusal to deliberate and is not a ground for discharge.  Similarly, the circumstance that a juror disagrees with the majority of the jury as to what the evidence shows, or how the law should be applied to the facts ... does not constitute a refusal to deliberate and is not a ground for discharge." (*People v. Cleveland* (2001) 25 Cal.4th 466, 485; *People v. Wilson* (2008) 44 Cal.4th 758, 824 (*Wilson*).)

However, a juror who refuses to follow the court's instructions because of a personal bias or any other reason, or who proposes to reach a verdict without respect to the law or evidence, commits misconduct and should be discharged under section 1089. (*Engelman*, *supra*, 25 Cal.4th at pp. 442, 448; *People v. Fuiava* (2012) 53 Cal.4th 622, 713.)  "[A] juror is required to apply the law as instructed by the court, and refusal to do so *during deliberations* may constitute a ground for discharge of the juror.  [Citation.]" (*Engelman*, *supra*, 28 Cal.4th at p. 443, italics in original.)

"A sitting juror's actual bias, which would have supported a challenge for cause, renders [her] 'unable to perform [her] duty' and thus subject to discharge and substitution...." (*People v. Keenan* (1988) 46 Cal.3d 478, 532.)  It has been recognized that "no amount of questioning" of a juror may "lead to an outright admission of bias," and the trial court may properly rely "upon the testimony of other jurors in determining the issue." (*People v. Thomas*, *supra*, 218 Cal.App.3d at p. 1485.)  "[T]rial courts are frequently confronted with conflicting evidence on the question whether a deliberating juror has exhibited a disqualifying bias.  [Citation.]  'Often, the identified juror will deny it and other jurors will testify to examples of how he or she has revealed it.'  [Citation.]

In such circumstances, the trial court must weigh the credibility of those testifying and draw upon its own observations of the jurors throughout the proceedings. We defer to factual determinations based on these assessments. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 590.)

"Although decisions to investigate juror misconduct and to discharge a juror are matters within the trial court's discretion [citation], we have concluded 'a somewhat stronger showing' than is typical for abuse of discretion review must be made to support such decisions on appeal. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 589.) "[T]he basis for a juror's disqualification must appear on the record as a '*demonstrable reality*.' This standard involves 'a more comprehensive and less deferential review' than simply determining whether any substantial evidence in the record supports the trial court's decision. [Citation.] It must appear 'that the court as trier of fact *did* rely on evidence that, in light of the entire record, supports its conclusion that bias was established.' [Citation.] However, in applying the demonstrable reality test, we do not reweigh the evidence. [Citation.] The inquiry is whether 'the trial court's conclusion is manifestly supported by evidence on which the court actually relied.' [Citation.]" (*Id.* at pp. 589–590, first italics added, second italics in original, fn. omitted; *People v. Homick* (2012) 55 Cal.4th 816, 899.)

"In reaching that conclusion, the reviewing panel will consider not just the evidence itself, but also the record of reasons the court provides. A trial court facilitates review when it expressly sets out its analysis of the evidence, why it reposed greater weight on some part of it and less on another, and the basis of its ultimate conclusion that a juror was failing to follow the oath. In taking the serious step of removing a deliberating juror the court must be mindful of its duty to provide a record that supports its decision by a demonstrable reality." (*People v. Barnwell*, *supra*, 41 Cal.4th at p. 1053.) "That heightened standard more fully reflects an appellate court's obligation to

protect a defendant's fundamental rights to due process and to a fair trial by an unbiased jury." (*Id*. at p. 1052.)

### B. Analysis

We begin with the process used by the court in this case. When the trial court is notified that a juror has a disqualifying bias, it has a duty to investigate the allegation. (*Lomax*, *supra*, 49 Cal.4th at p. 592.) "Out of concern to protect the sanctity of jury deliberations, we have cautioned that this inquiry 'should be as limited in scope as possible' and 'should focus upon the conduct of the jurors, rather than upon the content of the deliberations.' [Citation.] 'Additionally, the inquiry should cease once the court is satisfied that the juror at issue is participating in deliberations and has not expressed an intention to disregard the court's instructions or otherwise committed misconduct, and that no other proper ground for discharge exists.' [Citation.]" (*Ibid*.)

The court's inquiry in this case was sufficiently restrained. In response to the foreperson's first note, it initially questioned the foreperson and reinstructed the jury. It then questioned Juror No. 7, and asked what it could do to assist the deliberative process. Juror No. 7 asked the court to speak to the foreperson on her behalf. The court did so, again re-instructed the jury, and advised the prosecutor there was no basis to remove Juror No. 7.

It was only after Juror No. 7's second note, and her responses to the court's questions, that the court decided to question the rest of the jurors. In doing so, the court did not affirmatively ask the other jurors about Juror No. 7, and did not permit the attorneys to question the jurors. Instead, the court generally asked the jurors whether everyone had the chance for free and open discussion. Nearly every juror responded by bringing up Juror No. 7 on his or her own accord, and offered similar descriptions of Juror No. 7's repeated refusals to follow the instructions, intent to rely on her alleged personal knowledge of the law, and her avowed personal bias against all law enforcement officers because of an unrelated incident.

The court's careful examination of each juror, and its lengthy findings, created a record which showed a demonstrable reality that Juror No. 7 committed misconduct during deliberations by deciding the case based on her own personal bias. "[A] bias against law enforcement officers that renders a juror unable to fairly weigh police testimony is grounds for the juror's replacement. [Citations.]" (*People v. Barnwell*, *supra*, 41 Cal.4th 1038, 1051.) Juror No. 7's categorical position that all law enforcement witnesses were not credible, regardless of the evidence, "reflected an undisclosed bias that rendered [her] unable to perform [her] duty as a juror and properly subject to discharge under section 1089. [Citation.]" (*Lomax*, *supra*, 49 Cal.4th at p. 591.)

Nearly every juror independently attributed these type of comments to Juror No. 7. Juror No. 2 (the foreperson) said Juror No. 7 did not believe the witnesses based on her "personal experience" of being profiled, but Juror No. 7 never explained how she used her personal experience to decide the credibility of witnesses. Juror No. 1 said that Juror No. 7 did not believe the police based on her life experience. Juror No. 5 quoted Juror No. 7 as saying that she judged the credibility of witnesses based on her prior experience of being stereotyped by the police. According to Juror No. 8, Juror No. 7 said she did not "believe a word" the testifying officers said because of her prior experiences. Juror No. 10 did not identify Juror No. 7 as the source, but similarly said a juror kept talking about her prior bad experiences with the police, and "she wants to dismiss all the officers' testimonies" because of her bad experiences. Juror No. 10 also said this particular juror said she was not going to believe the facts or the law of the case "because of what she's seen in her history." Juror No. 11 quoted Juror No. 7 as saying "she didn't believe any of the officers" because of her " 'life experience.' "

Juror No. 7 also committed misconduct by insisting that she personally knew the law based on her employment experience, and her stated refusal to follow the court's instructions on the law. As explained by Juror No. 3, Juror No. 7 said she "knew how the

39.

law worked specifically." Juror No. 4 said Juror No. 7 claimed to have "a knowledge of the law outside of the law that we were to put into this case," and Juror No. 7 said her knowledge of the law "superseded the jury instructions that we had." Juror No. 2 (the foreperson) said Juror No. 7 did not want to follow the instructions. Juror No. 5 stated that Juror No. 7 said she knew the law because she worked with correctional officers, and she was relying on her alleged knowledge of the law instead of the law and evidence as presented at trial. Juror No. 8 similarly quoted Juror No. 7 as saying she "knows the law." Juror No. 9 quoted Juror No. 7 as saying that she knew the law, and the police "botched" the case because it was the "law" to test for gunshot residue. According to Juror No. 11, Juror No. 7 said she knew the law, she worked around officers, she knew some of them were bad, and "that's why she's not believing any of the officers, their testimony."

Defendants assert that a juror does not commit misconduct by relying on his or her personal experiences. Defendants are correct that courts "expect jurors to use their own life experiences when evaluating the evidence. [Citation.]" (*Wilson*, *supra*, 44 Cal.4th at p. 823.) "[D]uring the give and take of deliberations, it is virtually impossible to divorce completely one's background from one's analysis of the evidence. We cannot demand that jurors, especially lay jurors not versed in the subtle distinctions that attorneys draw, never refer to their background during deliberations." (*People v. Steele* (2002) 27 Cal.4th 1230, 1266.)

"It is not improper for a juror, regardless of his or her educational or employment background, to express an opinion on a technical subject, so long as the opinion is based on the evidence at trial. Jurors' views of the evidence, moreover, are necessarily informed by their life experiences, including their education and professional work." (*In re Malone* (1996) 12 Cal.4th 935, 963.)

"A juror may not express opinions based on asserted personal expertise that is different from or contrary to the law as the trial court stated it or to the evidence, but if

40.

we allow jurors with specialized knowledge to sit on a jury, and we do, we must allow those jurors to use their experience in evaluating and interpreting that evidence." *(People v. Steele*, *supra*, 27 Cal.4th at p. 1266.)  However, "[a] fine line exists between using one's background in analyzing the evidence, which is appropriate, even inevitable, *and injecting 'an opinion explicitly based on specialized information obtained from outside sources,' which we have described as misconduct*.  [Citation.]" (*Ibid.*, italics added)  "A juror … should not discuss an opinion explicitly based on specialized information obtained from outside sources.  Such injection of external information in the form of a juror's own claim to expertise or specialized knowledge of a matter at issue is misconduct.  [Citations.]" (*In re Malone*, *supra*, 12 Cal.4th at p. 963.)

For example, *Wilson* held that the trial court erred in removing a juror at the penalty phase because the record did not show to a "demonstrable reality" that he was unable to perform his duty.  (*Wilson*, *supra*, 44 Cal.4th at p. 814.)  The challenged juror explained that his decision was based on mitigating evidence about the defendant's abusive and dysfunctional family.  (*Id.* at pp. 814, 824.)  Although the juror appeared to have weighed the mitigating evidence more heavily than did the other jurors because of his experience as an African–American father, *Wilson* concluded his reliance on life experience was appropriate at the penalty phase and did not render him unable to serve. (*Id.* at p. 831.)  In contrast to *Wilson*, there was no indication in this case that Juror No. 7 relied on any admissible evidence, aside from her own personal experience, to conclusively determine that all law enforcement witnesses in this case were not credible. Instead, she repeatedly stated that she did not believe the prosecution witnesses because of her prior experience being "racially profiled" in Rosedale.

Juror No. 7's conduct was similar to the situation addressed in *In re Stankewitz* (1985) 40 Cal.3d 391, where a juror " 'consulted' his own outside experience as a police officer on a question of law," and reached a legal conclusion that was "totally wrong." (*Id*. at p. 399.)  *Stankewitz* held that had the juror merely kept his opinion to himself, "his

conduct might be the type of subjective reasoning that is immaterial for purposes of impeaching a verdict." (*Id.* at p. 400.) But his actions rose to the level of reversible misconduct when he shared the erroneous opinion with other jurors, and vouched for its correctness on the strength of his long service as a police officer. (*Ibid*.)

When the trial court addressed this situation, defendants complained that the court should have brought Juror No. 7 back for further questions after it had talked to the other eleven jurors, in order for Juror No. 7 to refute the allegations they made against her. A trial court, having heard evidence of a juror's "disabling bias," is permitted but not required to attempt "to rehabilitate that juror by further exploring what the juror really meant," and the court does not abuse its discretion "concluding there was no need to question [the juror] further because [her] disqualification was clear …." (*People v. Fuiava*, *supra*, 53 Cal.4th at p. 715.)

The trial court did not abuse its discretion when it declined to question Juror No. 7 for a third time. It had talked to Juror No. 7 twice, and Juror No. 7 had already made inconsistent statements about her conduct. During the second round of questions, the court asked Juror No. 7 what type of personal experience she was relying on. Juror No. 7 said she had worked for the military and the government since she was 18 years old, she had worked for the Department of Corrections for 13 years, and added, "[s]o why [*sic*] I … be bias against police officers or law enforcement?" The court asked Juror No. 7 whether she had used her "special knowledge or experience" to judge the witnesses instead of considering the evidence. Juror No. 7 said no, and complained the other jurors were bullying her. Upon further questioning, however, Juror No. 7 contradicted herself when the court asked if she had negative personal experiences with law enforcement. Juror No. 7 said she told the jurors that she had been racially profiled by the police in Rosedale, she told the jurors what happened to her, and that factored into her determination that a law enforcement witness was not credible.

The other 11 jurors, when generally asked about whether each juror had been able to freely discuss his or her opinions, separately attributed identical statements to Juror No. 7 – that she did not believe any of the prosecution witnesses because of her personal experience, and she was going to rely on her own knowledge of the law and not on the court's instructions.

Defendants also complained that the other 11 jurors committed misconduct toward Juror No. 7 because Juror No. 7 reached a different verdict, and disagreed with their opinions and conclusions. "[R]emoval of a holdout juror is proper where the facts demonstrate the juror is unable to follow the law. [Citation.]" (*People v. Harrison* (2013) 213 Cal.App.4th 1373, 1382.) The "trial court's attempt to ensure the jurors understood the law," and removal of a holdout juror who would not or could not follow the law, "cannot be viewed as an improper attempt to overcome a deadlock in the jury's deliberations." (*People v. Alexander* (2010) 49 Cal.4th 846, 928.) "The substitution of a juror for good cause pursuant to section 1089, even after deliberations have commenced, ' "does not offend constitutional proscriptions." ' [Citation.]" (*Wilson, supra,* 44 Cal.4th at pp. 820–821.)

### *New trial motion following juror removal*

Finally, while defendants have not addressed Castilleja's new trial motion, we find the court did not abuse its discretion when it denied the motion. The new trial motion was solely based on Juror No. 7's notarized statement, obviously prepared after she had been excused from the jury. Juror No. 7 restated the allegations she made to the court, that the other jurors were acting improperly toward her because they disagreed with her, and made new allegations of misconduct against the other jurors.

"When a party seeks a new trial based upon jury misconduct, a court must undertake a three-step inquiry. The court must first determine whether the affidavits supporting the motion are admissible. [Citation.] If the evidence is admissible, the court must then consider whether the facts establish misconduct. [Citation.] Finally, assuming

misconduct, the court must determine whether the misconduct was prejudicial. [Citations.] A trial court has broad discretion in ruling on each of these questions and its rulings will not be disturbed absent a clear abuse of discretion. [Citation.]" (*People v. Perez* (1992) 4 Cal.App.4th 893, 906.)

"Juror declarations are admissible to the extent that they describe overt acts constituting jury misconduct, but they are inadmissible to the extent that they describe the effect of any event on a juror's subjective reasoning process. [Citation.] Accordingly, juror declarations are *inadmissible* to the extent that they purport to describe the jurors' understanding of the instructions or how they arrived at their verdict. [Citations.]" (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124–1125, italics added; Evid. Code, § 1150; *People v. Steele, supra,* 27 Cal.4th at p. 1261.)

As the trial court noted, the majority of Juror No. 7's declaration was inadmissible because it reflected the deliberative process. The trial court found Juror No. 7's allegations that other jurors committed misconduct by consulting outside resources were not credible. The court's finding is supported by the record. Juror No. 7 had two opportunities to speak to the court about deliberations. Each time, Juror No. 7 freely complained that she was being bullied by the other jurors. When asked if she had anything more to add, Juror No. 7 never claimed the other jurors were consulting outside sources or otherwise violating the instructions. The court was also concerned by Juror No. 7's conduct immediately after she was excused from the jury, when she refused to leave the courthouse, tried to contact the remaining jurors, and appeared the following day to deliver sealed letters to the court and the attorneys and announced they had been "served."

In any event, we note that Juror No. 7 declared in her notarized statement that on the day she was dismissed, a juror said "the process needed to be concluded on that day because he did not want to return for another day of deliberations." Even if we were

consider Juror No. 7's notarized statement, we find no evidence that her removal coerced the verdict. Juror No. 7 was removed on August 8, 2013. The alternate juror was seated on the morning of August 9, 2013, and the court instructed the reconstituted jury to begin deliberations anew. There is no evidence the jury failed to follow the court's instructions, particularly since the jury did not return the verdicts until August 12, 2013, and the verdicts were not blanket findings of guilt. (See, e.g., *People v. Fuiava*, *supra*, 53 Cal.4th at p. 716.)

We conclude that defendant's statutory and constitutional rights to due process and a fair trial were not violated because the trial court's finding of good cause to dismiss Juror No. 7 is supported to a demonstrable reality, and the court did not abuse its discretion when it denied Castilleja's motion for new trial.

## II.     Ineffective Assistance; Imposition of the Third Strike Sentence

Castilleja was sentenced to a third strike term after the court found he had two prior strike convictions. The two prior strike convictions arose from a single case in 2007.

Castilleja contends his defense attorney was prejudicially ineffective for failing to file a motion for the court to exercise its discretion and dismiss one of his two prior strike convictions. Castilleja argues the trial court would have been required to grant such a motion because both prior convictions arose from the same case, and the error was prejudicial because he would not have received a third strike sentence.[19]

As we will explain, counsel was not prejudicially ineffective based on the state of the record and applicable law at the time of Castilleja's sentencing hearing, but we will remand the matter for Castilleja to make further appropriate sentencing motions.

---

[19] Defendants have joined in each other's issues. However, Gonzalez was not sentenced to a second or third strike term and this issue is inapplicable to his case.

A. **Background**

The information filed in this case alleged Castilleja had two prior strike convictions, based on Kern County Superior Court case No. BF117859: discharge of a firearm from a vehicle at a person (§ 12034, subd. (c)), and active participation in a criminal street gang (§ 186.22, subd. (a)).

In this case, the prosecution introduced the following documentary evidence to prove the prior strike convictions. According to those documents, a complaint was filed in case No. BF117859 on February 5, 2007. It charged Castilleja and codefendants Danny Macias, Victor Taporco, and Jose Medrano with four offenses, all of which were committed on January 21, 2007: count I, discharge of a firearm from a vehicle at victims Richard Moya, Mondo Moya, Ruben Escoto, and Brandy Buford (§ 12034, subd. (c)); count II, discharge of a firearm at an inhabited dwelling located at 135 L Street (§ 246); count III, assault with a deadly weapon, a .22-caliber revolver, on Richard Moya (§ 245, subd. (a)(1)), with the special allegation that Castilleja personally used a firearm in count III (§ 12022.5, subd. (a)); gang enhancements against all defendants in counts I through III (§ 186.22, subd. (b)); and count IV, active participation in a criminal street gang (§ 186.22, subd. (a), with special allegations that Castilleja and his codefendants carried firearms (§ 12021.5).

On March 28, 2007, prior to a preliminary hearing being held, Castilleja pleaded no contest to count I, discharge of a firearm from a vehicle against the four victims; and guilty to count IV, active participation in a criminal street gang. The court found a factual basis for the plea based on the stipulation of the parties. The court dismissed all allegations as to counts I and IV, and dismissed counts II and III in the interests of justice.

On April 25, 2007, Castilleja was sentenced to seven years for count I, and a consecutive term of eight months (one-third the midterm) for count IV.

The instant record does not contain any other evidence about defendant's prior strike convictions. The court found the prior conviction allegations true based on the documentary evidence introduced by the prosecution.

**B. *Burgos* and *Benson***

Castilleja's ineffective assistance claim is based on a series of cases which addressed the imposition of a third strike term when the prior convictions arise from the same case. Castilleja was sentenced on November 7, 2013. At that time, the relevant law was based on *People v. Benson* (1998) 18 Cal.4th 24 (*Benson*) and *People v. Burgos* (2004) 117 Cal.App.4th 1209 (*Burgos*).

In *Benson,* the defendant had two strike convictions arising out of the same set of facts: residential burglary and assault with intent to commit murder. (*Benson, supra,* 18 Cal.4th at p. 26.) The facts underlying the strike convictions established the defendant committed multiple acts: After entering the victim's residence, ostensibly to retrieve some keys he had left there, he stabbed her 20 times. At the time of the prior convictions, the trial court sentenced the defendant on the burglary, but stayed execution of the sentence on the assault pursuant to section 654. (*Id.* at pp. 26–27.)

*Benson* addressed the defendant's contention that his two prior convictions only constituted one prior strike. Benson disagreed and held each prior conviction qualified as a separate strike under the "Three Strikes" law, notwithstanding the trial court stayed sentence on one of the felonies under section 654. (*Benson, supra,* 18 Cal.4th at p. 26.) Rejecting the defendant's contention on appeal that the result was harsh, the Supreme Court said that, in the absence of constitutional infirmity, it was not at liberty to alter the intended effect of the Three Strikes law on such grounds. (*Id.* at pp. 35–36.)

In a footnote, the *Benson* court said:

> "Because the proper exercise of a trial court's discretion under section 1385 necessarily relates to the circumstances of a particular defendant's current and past criminal conduct, we need not and do not determine whether there are some circumstances in which two prior felony

47.

convictions are so closely connected – for example, when multiple convictions arise out of a single act by the defendant as distinguished from multiple acts committed in an indivisible course of conduct – that a trial court would abuse its discretion under section 1385 if it failed to strike one of the priors." (*Benson, supra,* 18 Cal.4th at p. 36, fn. 8.)

*Benson* thus recognized the distinction between multiple convictions arising out of a single act and multiple convictions arising out of multiple acts during an indivisible course of conduct.

*Burgos* relied on *Benson's* footnote and held the trial court in that case abused its discretion in refusing to strike one of the defendant's two prior convictions in furtherance of justice under section 1385, because the two prior strike convictions – attempted carjacking (§ 215) and attempted robbery (§ 211) – arose from the same act, the attempted forcible taking of a vehicle, and also because section 215, subdivision (c), precluded sentencing for both offenses. As to the "same act" rationale, *Burgos* read the *Benson* footnote as "strongly indicat[ing] that where the two priors were so closely connected as to have arisen from a single act, it would necessarily constitute an abuse of discretion to refuse to strike one of the priors." (*People v. Burgos, supra,* 117 Cal.App.4th at p. 1215.)

## C. <u>Analysis</u>

Castilleja argues that his attorney should have relied on *Benson* and *Burgos*, and moved for the court to dismiss one of the two prior strike convictions because they were based on the same case and a single act. Castilleja argues counsel's failure was prejudicial because the court would have been required to dismiss one strike and impose a second strike term.

There are several problems with this argument. First, at the time of Castilleja's sentencing hearing, it was not clear whether a sentencing court was mandated to dismiss one of two prior strikes if the prior convictions were based on the same case or a single act. Some courts interpreted *Burgos* as holding that the "same act" circumstance was just one factor in an analysis conducted under section 1385 and *People v. Superior Court*

48.

(*Romero*) (1996) 13 Cal.4th 497.  (*People v. Scott* (2009) 179 Cal.App.4th 920, 930, overruled in *People v. Vargas* (2014) 59 Cal.4th 635 (*Vargas*).)  The actual holding of *Burgos* was deemed "doubtful, and … led to a divergence of views.  Several treatises indicate that *Burgos* states a dispositive rule.  [Citations.]  On the other hand,… we are aware that some *unpublished* − and therefore *uncitable* [citation] − cases take the view that *Burgos* merely identified an additional factor a trial court must weigh in a *Romero* analysis."  (*People v. Scott*, *supra*, 179 Cal.App.4th 920, 930.)  "Whichever rule *Burgos* meant to announce, we conclude the 'same act' circumstances posed by robbery and carjacking cases provide a factor for a trial court to consider, but do not *mandate* striking a strike."  (*Id.* at p. 931, italics in original.)

Thus, at the time Castilleja was sentenced, there were divergent authorities as to whether a sentencing court was mandated to dismiss one of two prior strike convictions arising from the same case or a single act, or that factor was just one circumstance for the court to consider under a request to dismiss the prior strikes under section 1385 and *Romero*.

Castilleja argues that the sentencing court would have been required to dismiss one of his prior strikes based on *People v. Mesa* (2012) 54 Cal.4th 191.  *Mesa* is inapposite to his argument.  *Mesa* held that section 654 precluded the imposition of multiple punishment for the defendant's current convictions, and section 654 applied, when the convictions were based on a single act.  *Mesa* did not address *Benson* and *Burgos*, or whether a sentencing court should dismiss prior strike convictions based on a single act or arising from a single case.  (*Id*. at pp. 200−201.)

Second, even if Castilleja's attorney moved to dismiss one of his prior strikes under *Benson* and *Burgos*, it was not entirely clear whether his two prior convictions from 2007 arose from the same act.  The record of conviction, introduced to the sentencing court and part of the appellate record, shows that the complaint in case No. BF117859 charged Castilleja and three codefendants with committing four felonies

49.

on the same day.  Castilleja pleaded no contest to count I, that he discharged a firearm from a vehicle at four separate victims; and he pleaded guilty to count IV, active participation in a criminal street gang.  While the complaint alleged Castilleja committed both crimes on the same day, the record of conviction, as introduced by the prosecution, did not clarify whether the crimes were based on the same act, and instead showed that count I was committed against multiple victims.

### *Vargas*

In his reply brief, Castilleja concedes that *Mesa* did not conclusively resolve the *Benson/Burgos* issue, but asserts the matter has now been decided in *Vargas*, *supra*, 59 Cal.4th 635, and argues he should get relief on appeal because the sentencing court would have abused its discretion if it refused to dismiss one of his two prior strike convictions.[20]

*Vargas* was decided in July 2014, after Castilleja was sentenced in this case.  In *Vargas*, the court settled the issues raised in *Benson* and *Burgos*, and held that when a defendant's prior strike convictions are based on committing a single criminal act on a single victim resulting in two felony convictions under different statutes, the trial court abuses its sentencing discretion if it fails to dismiss one of the two strike convictions. *Vargas* reasoned that when the offender commits but a single act, he or she does not pose a greater risk to society merely because the Legislature has chosen to criminalize the act in different ways.  (*Vargas*, *supra*, 59 Cal.4th at p. 646.)

> "That a case would be extraordinary in which an offender with two prior qualifying convictions would fall outside the spirit of the Three Strikes law does not mean such cases do not exist.  We must decide whether defendant's case falls into this rare category, that is, where the facts − here, that defendant's two strikes were based on the same act −

---

[20] When a party fails to raise an issue in the opening brief, raising it for the first time in a reply brief or at oral argument, we generally decline to address the issue, or address it in a summary manner.  (*People v. Duff* (2014) 58 Cal.4th 527, 550, fn. 9.)  We will address Castilleja's argument since *Vargas* was decided on July 10, 2014, after Castilleja's opening brief was filed.

demonstrate that no reasonable person would disagree that defendant fell outside the spirit of the Three Strikes law...." (*Id.* at pp. 641–642.)

The defendant in *Vargas* had two prior strike convictions for robbery and carjacking, which "were based on the same act of taking the victim's car by force ...." (*Vargas, supra,* 59 Cal.4th at pp. 640, 645.) *Vargas* held the trial court was required to dismiss one of the prior convictions (*id.* at p. 639), explaining that treating such a defendant as a third strike offender "was inconsistent with the intent underlying both the legislative and initiative versions of the Three Strikes law. [Citation.]" (*Id.* at p. 645.) The defendant's prior strikes "were not only tried in the same proceeding and committed during the same course of criminal conduct, they were based on the same act, committed at the same time, against the same victim." (*Id.* at p. 638.) *Vargas* explained "the voting public would reasonably have understood the 'Three Strikes' baseball metaphor to mean that a person would have three chances – three swings of the bat, if you will – before the harshest penalty could be imposed. The public also would have understood that no one can be called for two strikes on just one swing. Permitting the trial court below to treat defendant's 1999 robbery and carjacking convictions as separate strikes – despite the fact they were based on a single criminal act – would do just that, and thus contravene the voter's clear understanding of how the Three Strikes law was intended to work." (*Id.* at p. 646.)

We are bound by the decisions of our Supreme Court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.) However, we are also limited to the record on appeal, from which it is not clear whether Castilleja's prior strike convictions, although committed on the same day, were based on a single act, committed at the same time, against the same victim. (*Vargas*, *supra*, 59 Cal.4th at p. 638.)

"Determining whether a prior conviction qualifies as a strike under the Three Strikes law is ... the type of inquiry that judges traditionally perform as part of the sentencing function. Often this determination is purely legal, with no factual content whatever." (*People v. Kelii* (1999) 21 Cal.4th 452, 456.) "Sometimes the determination

does have a factual content, just as the question whether convictions were brought and tried separately has a factual content." (*Ibid.*) "But these factual questions are of limited scope," and the court's determination in such situations is guided by the record of conviction, as defined in *People v. Guerrero* (1988) 44 Cal.3d 343. (*People v. Kelii, supra,* 21 Cal.4th at p. 456.)

The "record of conviction" includes charging documents, the information, minute orders, the preliminary hearing transcript (in the absence of a trial), the trial transcript, a reporter's transcript, change of plea form, the court records of the defendant's admission or plea, and the appellate record, including the appellate opinion, for the prior conviction. (*People v. Reed* (1996) 13 Cal.4th 217, 223–224; *People v. Woodell* (1998) 17 Cal.4th 448, 456; *People v. Bartow* (1996) 46 Cal.App.4th 1573, 1579–1580; *People v. Abarca* (1991) 233 Cal.App.3d 1347, 1350; *People v. Harrell* (1989) 207 Cal.App.3d 1439, 1443–1444.) It does not include police reports. (*Draeger v. Reed* (1999) 69 Cal.App.4th 1511, 1521.) The California Supreme Court has held multiple hearsay and "[n]arration of 'reported' events" in a probation report are inadmissible as part of the record of conviction. (*People v. Reed, supra,* 13 Cal.4th at p. 230; *People v. Trujillo* (2006) 40 Cal.4th 165, 179.)

We decline to find Castilleja's defense attorney was prejudicially ineffective based on the state of the record and conflicting legal authorities at the time of his sentencing hearing, which occurred before *Vargas* was decided. We also decline to make factual findings for the first time on appeal.

However, in the interest of judicial economy, we order the matter remanded for the limited purpose of allowing Castilleja to file a motion pursuant to *Romero* and *Vargas*, supported by the appropriate documentary evidence from the record of conviction, for the court to consider the matter and determine whether Castilleja's prior strike convictions should be stricken in light of the *Vargas* decision.

### III. Correction of Gonzalez's Sentence

Gonzalez was sentenced to an aggregate term of nine years for count I, attempted murder, plus 25 years to life for the firearm enhancement; the court stayed the terms for the other counts and enhancements.

As to count II, discharging a firearm at an occupied motor vehicle (§ 246), the court imposed the "upper term" of nine years, plus additional terms for the enhancements, and stayed the entirety of the term pursuant to section 654.

Gonzalez contends, and the People concede, that the upper term for a violation of section 246 is seven years, the court intended to impose the upper term, and Gonzalez received an unauthorized sentence because the court erroneously stated the upper term was nine years. Gonzalez's aggregate sentence will not change since the entirety of the term imposed for count II was stayed pursuant to section 654.[21]

The abstract of judgment must be amended to reflect that Gonzalez was sentenced to the upper term of seven years for count II, with the entirety of the term imposed for that count stayed pursuant to section 654.

### DISPOSITION

The abstract of judgment for Gonzalez is ordered amended to reflect that he was sentenced to the upper term of seven years for count II. As modified, the judgment is affirmed in all other respects. The trial court shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.

The judgment of conviction is affirmed as to Castilleja. Castilleja's sentence is vacated for the limited purpose of remanding the case for a new sentencing hearing, as discussed above, for Castilleja to make an appropriate motion pursuant to *Romero* and *Vargas*. If Castilleja fails to make such a motion, or the court denies the motion, the

---

[21] Castilleja has joined all issues raised by Gonzalez, but this sentencing issue is inapplicable to Castilleja. The court did not commit the same sentencing error when it imposed the multiple third strike terms against Castilleja.

previously imposed sentence shall be reinstated.  If the court grants the motion, it shall prepare and forward to all appropriate parties a certified copy of an amended abstract of judgment.

 

_____
POOCHIGIAN, Acting P.J.

WE CONCUR:

_____
FRANSON, J.

_____
PEÑA, J.

54.